James C. FINLEY, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CM–957.

District of Columbia Court of Appeals.

Submitted Sept. 24, 1993.
Decided Oct. 7, 1993.

Dale C. Saliba, Arlington, VA, filed a brief for appellant.

J. Ramsey Johnson, U.S. Atty., and John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., Washington, DC, filed a brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and BELSON, Senior Judge.

SCHWELB, Associate Judge:

Finley was charged by information with simple assault on Andrew Nathan, in violation of D.C.Code § 22-504 (1989). Both men are in their sixties. Finley claimed that he acted in self-defense, but following a jury trial he was found guilty as charged. On appeal, Finley contends that the trial judge committed reversible error by improperly restricting *voir dire* and by overruling his objections to certain testimony. We affirm.

## I.

Finley claims that the trial judge erroneously declined to inquire on *voir dire* whether any of the jurors had watched a four-hour television program which, according to Finley's attorney, aired during the two evenings before the jury was selected. Defense counsel initially proffered in the trial court that "the main character [in the program] was the defense attorney, and he presented a false alibi defense and he ended up hoodwinking the jury on that false alibi defense." Counsel then corrected himself and stated that "the jury was hoodwinked by self-defense." *Id.* Counsel asserted that

it was a false defense which the main character presented, and as a result of that defense he got this female defendant acquitted. He was able to fool the jury with that defense. And I would submit that— this program ran for four hours, two hours Sunday night and then the final two hours last night, and I believe that anybody that saw that program would be leery of a self-defense defense hearing it the next day. They're going to be saying haven't I heard this before and isn't this a trip?

Whether, you know, consciously or subconsciously, I submit that after seeing that program a juror could not be impartial, would be disinclined to believe the theory of self-defense.

The judge declined to pose the requested questions. He stated that jurors know that such programs "are figments of some writer's imagination which may or may not be consistent with what happens in real life." The judge stated that he would explain to the prospective jurors that self-defense is a legitimate defense and would inquire whether any member of the venire believed the contrary.[1]

## II.

Finley contends that the judge's ruling denied him his right under the Sixth Amendment to trial by an impartial jury. Asserting that the "television extravaganza" was "most certainly" viewed by some of the jurors, he argues in his brief in this court that

[t]he program had impact. It centered upon a defense counsel and his female client who successfully raised a false "self-defense" claim to get the wrongdoer acquitted. The wrongdoer won. The result was distressing. The program with its stunning ending culminated the very night before the jury was selected. The jury in the television was hoodwinked by a fraudulent self-defense claim. This would certainly make the jury leery upon reporting

---

1. The *voir dire* examination itself, which was conducted by the judge, was not transcribed and is not a part of the record on appeal.

to court the very next day and being confronted with the same defense claim.

The *voir dire* at an absolute minimum should have revealed which members of the panel viewed the program. If this had not led to disqualification for cause, it was certainly necessary to enable appellant to exercise his challenges in an intelligent manner.

Trial counsel should be afforded [the] opportunity on *voir dire* to gain necessary information upon which to base peremptory challenges. *United States v. Ledee*, 549 F.2d 990 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977). Similarly, defendant is entitled to have sufficient information brought out on *voir dire* to enable him to exercise his challenges in a reasonably intelligent manner. *United States v. Rucker*, 557 F.2d 1046 (4th Cir. 1977). It was no remedy for the trial judge to permit *voir dire* along the line of "whether anybody believed self defense is not a legitimate defense." Perfunctory *voir dire* has been condemned where the judge relies on a juror's own assessment of impartiality without something more. *United States v. Flores–Elias*, 650 F.2d 1149 (9th Cir.), *cert. denied*, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981).

The something more necessary to appellant's constitutional right to a fair and impartial jury in the case below was specific inquiry as to which [prospective jurors] watched the television program aforesaid.

 The purpose of *voir dire* is to afford parties their Sixth Amendment right to an impartial jury. *Jenkins v. United States*, 541 A.2d 1269, 1273 (D.C.1988). This is achieved when the court offers parties a full and fair opportunity to expose bias or prejudice on the part of the prospective jurors. *Glymph v. United States*, 490 A.2d 1157, 1162 (D.C.1985) (quoting *United States v. Robinson*, 154 U.S.App.D.C. 265, 269–70, 475 F.2d 376, 380–81 (1973)); *accord, Boertje v. United States*, 569 A.2d 586, 592 (D.C.1989). A trial court has broad discretion as to how to uncover such bias when conducting the *voir dire*. *Matthews v. United States*, 599 A.2d 1389, 1389 (D.C.1991) (quoting *Boertje, supra*, 569 A.2d at 592).

 The court's discretion must, however, be exercised in accordance with "the essential demands of fairness." *Cordero v. United States*, 456 A.2d 837, 841 (D.C.1983) (quoting *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931)). "Fairness requires a careful *voir dire* examination when there is a 'significant likelihood' of juror prejudice." *Cordero, supra*, 456 A.2d at 841 (quoting *Ristaino v. Ross*, 424 U.S. 589, 598, 96 S.Ct. 1017, 1022, 47 L.Ed.2d 258 (1976)). "[A]bsent abuse of ... discretion, and a showing that the rights of the accused have been substantially prejudiced thereby, the trial [court's] rulings as to the scope and content of *voir dire* will not be disturbed on appeal." *United States v. Robinson*, 154 U.S.App.D.C. 265, 269, 475 F.2d 376, 380 (1973); *accord, Cordero, supra*, 456 A.2d at 841 (citing *Khaalis v. United States*, 408 A.2d 313, 335 (D.C.1979), *cert. denied*, 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980)).

 In *Morris v. United States*, 564 A.2d 746, 748 (D.C.1989), which involved the airing of television programs on "date rape" during a rape trial, the court stated that

[w]hen jurors have been exposed to media discussion of issues they are considering, a two-part determination is required. First, the trial court must decide whether the information was potentially prejudicial. Only if the court determines that it was, it must *voir dire* the jurors to determine whether they have been prejudiced by it.

(Citations omitted). Not every newspaper article or television program requires such interrogation during *voir dire*, and "[u]nless there is substantial reason to fear prejudice, the trial judge may decline to question the jurors." *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir.1974). Moreover, the determination whether such questioning is appropriate is confided to the sound discretion of the trial judge. *See, e.g., United States v. Edwards*, 366 F.2d 853, 873 (2d Cir.1966), *cert. denied*, 386 U.S. 919, 87 S.Ct. 882, 17 L.Ed.2d 790 (1967).

 In the present case, the trial judge reasonably concluded that Finley had failed to make the required threshold showing of

potential prejudice. This is not a case in which the jurors who watched the program could have learned something unfavorable to Finley. Rather, the program allegedly depicted in an unfavorable light a defense attorney in another (apparently fictitious) case. As the trial judge recognized, a reasonable juror who has taken an oath to decide Finley's innocence or guilt solely on the basis of the evidence and the court's instructions as to the law could be trusted not to assume, simply because a defense attorney in a television drama was untrustworthy, that Finley's counsel was or might be attempting to deceive the jurors.

Our conclusion is further reinforced by the Supreme Court's recent decision in *Mu'min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). In *Mu'min*, the defendant had made a widely publicized confession of a brutal murder. During *voir dire*, counsel sought to question prospective jurors about the content of any publicity which had come to their attention with respect to the case, but the trial judge refused to permit such questioning. The Virginia courts sustained Mu'min's conviction, and the Supreme Court affirmed.

The Court acknowledged that "[i]f counsel were allowed to see individual jurors answer questions about exactly what they had read, a better sense of the juror's general outlook on life might be revealed, and such a revelation would be of some use in exercising peremptory challenges." *Id.* at ——, 111 S.Ct. at 1905. The Court noted, however, that peremptory challenges are not required by the Constitution. *Id.* (citing *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988)). The Court further recognized that "[s]uch questions might also have some effect in causing jurors to reevaluate their own answers as to whether they had formed any opinion about the case, but this is necessarily speculative." *Id.* Nevertheless, noting that "[t]he *voir dire* examination conducted by the trial court in this case was by no means perfunctory," *id.* 500 U.S. at ——, 111 S.Ct. at 1908, the Court held that the trial judge had no constitutional obligation to ask the questions proposed by the defense. *Id.*

If, as *Mu'Min* holds, a defendant has no constitutional right to be apprised of publicity in his or her own case of which a prospective juror has been made aware, even where that publicity might include information regarding a confession, then, *a fortiori*, he or she has no such right to an inquiry about a juror's familiarity with a different and apparently fictitious case aired on television. The danger of unfairness to the defense was far greater in *Mu'Min* than in this case, and the Court's rejection of Mu'Min's contentions precludes us from sustaining Finley's.

### III.

During the course of his testimony for the prosecution, Nathan stated that his relationship with Finley

> was always casual, hello, good-bye, and he would call me at times and, like I say, invite me to his home, or he would ask me to do certain things, but he was always very articulate and very pompous every time he [said] something to you.

Finley's counsel objected, apparently to Nathan's characterization of Finley as "pompous," but the judge overruled the objection.

A few transcript pages later, Nathan testified that Finley was

> getting angry because I seen him get angry before because he previously, he had had an argument with someone else——
> MR. SALIBA [DEFENSE COUNSEL]: Objection, Your Honor.
> THE COURT: No. I will overrule that. Go right ahead.
> THE WITNESS: And so anyway I saw where that he was getting loud and—all right—and getting violent.
> MR. SALIBA: Objection, Your Honor.
> THE WITNESS: I decided to just end it.
> THE COURT: Well, sh-h-h, sh-h-h. All right. At this point I will sustain the objection to the getting violent. I assume that's what you were objecting to.
> MR. SALIBA: Yes, sir.

Finley now claims that these evidentiary rulings were erroneous and that they warrant reversal of his conviction.

■ Nathan's remark about Finley's alleged pompousness came in the middle of a rather favorable account of his relationship with Finley. Assuming, without deciding,

that the objection should have been sustained,[2] we are at a loss to see how Finley could possibly have been prejudiced. Any error was plainly harmless under *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

■ Turning to the testimony regarding Finley's alleged anger, the judge sustained the objection to the words "getting violent," and defense counsel confirmed that this was the testimony to which he was objecting. If counsel was not satisfied with the judge's ruling, he was obliged to make that clear at the time. *See, e.g., Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* — U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992); *Mack v. United States,* 570 A.2d 777, 782 (D.C.1990). In any event, assuming that the defense preserved its objection to the judge's initial ruling permitting the witness to state that Finley was angry, the judge did not abuse his discretion by so ruling. A witness may testify that an individual appeared nervous. *United States v. Masterberg,* 503 F.2d 465, 470 (9th Cir.1974). Testimony that Finley appeared angry is not significantly different and may likewise properly be received. *See also Brothers v. Adams,* 152 Kan. 675, 687–88, 107 P.2d 757, 766 (1940) (non-expert witness may testify that a woman was sometimes "very much annoyed" by second woman's visits); *Johnson Freight Lines v. Tallent,* 53 Tenn.App. 464, 471, 384 S.W.2d 46, 50 (1964) (lay witness may testify that individual appeared "upset, hostile, and to withdraw from social contacts"); 32 C.J.S., *Evidence* § 546(38), at 208 (1964 & Supp. 1993). Finally, even if the judge's ruling had been erroneous, which it was not, we are satisfied that there was no prejudice.

### IV.

For the foregoing reasons, Finley's conviction must be and is hereby

*Affirmed.*

U.S.App.D.C. 82, 85, 503 F.2d 173, 176 (1974) (emphasizing trial court's broad discretion in this area).